## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**PATRICIA FRENCH**,

       Plaintiff,

vs.                                 No.    **CIV 01-947 MCA/RLP**

**JAMES BARNER**,
**MARY MOLINA-MESCALL**, and
**THE CITY OF ALBUQUERQUE**,

       Defendants.


## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendants' Motion for Summary Judgment* [Doc. No. 35] filed on August 19, 2002.  Having considered the pleadings and exhibits of record, the relevant law, and otherwise being fully advised in the premises, the Court finds that grounds exist for granting Defendant's motion in part and denying Defendant's motion in part as explained below.

## I.    BACKGROUND

On or about July 26, 2000, Plaintiff Patricia French filed a charge of discrimination against Defendant City of Albuquerque with the Equal Opportunity Employment Commission (EEOC), alleging that Defendant James Barner engaged in racial discrimination and retaliation against her.  (Ex. L to Pltf.'s Resp.)  The EEOC issued a right-to-sue letter

regarding Plaintiff's charges of racial discrimination and retaliation on May 17, 2001.  (Ex. N to Pltf.s Resp.)  On August 17, 2001, Plaintiff filed a civil action against Defendants James Barner, Mary Molina-Mescall, and the City of Albuquerque under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e to 2000e-17 (1994 & West Supp. 2002), the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and 42 U.S.C. § 1983.

Defendant moved for summary judgment on August 19, 2002.  That motion was briefed by the parties, and the Court granted Plaintiff leave to file a surreply.  [Doc. No. 51.] For the purpose of analyzing Defendant's motion, the evidence submitted with the parties' briefs can be summarized in the light most favorable to Plaintiff as follows.

Since February 1993, Plaintiff has been employed by Defendant City of Albuquerque as the Supervisor of the Central Records, Imaging, and Officer Service Units within the Records Division of the Albuquerque Police Department (APD).  Plaintiff, as well as seven other supervisors and one administrative assistant, work under the supervision of the Manager of APD's Records Division, who in turn works under the supervision of the Deputy Director of APD's Support Services Bureau.  (French Dep. at 7; Barner Dep. at 9; Ex. X to Pltf.'s Resp.)

Defendant Barner occupied the position of Manager of APD's Records Division from about March 1999 until he was transferred elsewhere in October 2000.  Defendant Molina-Mescall was Deputy Director of APD's Support Services Bureau during and after that time

period. (French Dep. at 44; Barner Dep. at 8, 63; Saenz Dep. at 15-16; Molina-Mescall Aff. at 1; Ex. X to Pltf.'s Resp.)

The specific instances of discriminatory and retaliatory conduct identified by Plaintiff are as follows.  First, Plaintiff alleges that Defendants' actions deprived her of compensation and benefits to which she was entitled.  In particular, Plaintiff claims that Defendant Barner required her to be on call twenty-four hours a day, seven days a week from September 1999 to October 2000, in order to handle emergency requests from police officers for certain records.  Plaintiff was not compensated for her on-call status during this period despite the existence of a City policy "which says that you will be compensated eight hours of straight comp time for every week that you're on call."  (Saenz Dep. at 50; French Aff. 9-16-02, at 2; Ex. F to Pltf.'s Resp.)

On July 26, 2000, Plaintiff sent an e-mail message to Defendant Barner requesting to work four ten-hour days per week.  (Ex. K to Pltf.'s Resp.)  Defendant Barner denied Plaintiff's request in August 2000, after she had filed her complaint with the EEOC. (French. Aff. 9-16-02, at 5; French Dep. at 72-73; Barner Dep. at 38, 40; Ex. L to Pltf.'s Resp.)

In March or April 2002, Plaintiff's position in the APD Records Division appeared on a list of positions that were targeted for possible layoffs due to a City-wide budget crisis. Plaintiff's supervisor at that time, Captain Marie Saenz, did not recommend Plaintiff's position to be targeted for the layoffs and suspected that a subordinate of Defendant Molina-Mescall may have played a role in putting Plaintiff's position on the list.  (Saenz Dep. at 42-

44.)  Although Plaintiff did not lose her position as a result of this action, the appearance of her position on the list caused her to feel that her job was in jeopardy.  (French Aff. 9-16-02, at 8.)

Between August 19, 2002, and September 9, 2002, Plaintiff claims she was rendered ineligible for approximately twenty-eight hours of overtime compensation or compensatory time as a result of an investigation stemming from an anonymous letter that accused Plaintiff of altering and deleting police records.  According to Plaintiff, it should have been obvious to the investigators that this accusation was unfounded because the City has never granted Plaintiff the type of computer privileges necessary to alter or delete such records.  (French Aff. 9-16-02, at 8.)

In addition, Plaintiff has documented two specific instances in which she was denied certain training opportunities.  On August 9, 2000, Defendant Barner denied Plaintiff's request to take a class on business writing and grammar skills with an enrollment fee of $399 and instructed her to research the availability of similar training at less expense from TVI, a local community college.  On August 17, 2000, Defendant Barner disapproved a request to attend a seminar on records management emergency preparedness and disaster recovery with a registration cost of between $200 and $250.  He instructed Plaintiff to first join the organization that was sponsoring the seminar and to send him a memo if interested.  (French Dep. at 115; Ex. S to Pltf.'s Resp.)

Plaintiff also claims that Defendant Barner engaged in conduct that was threatening and disparaging.  In response to Plaintiff's request to work four ten-hour days, Plaintiff

claims that Defendant Barner screamed and hollered at her, got up from his desk, and approached her in a manner that made her feel physically threatened. (French Dep. at 109-10.)  In November 1999, Defendant Barner shouted at Plaintiff because another supervisor had placed a computer on the desk of Defendant Barner's administrative assistant. (French. Aff. 9-16-02, at 3.)   In January 2000, Plaintiff alleges that Defendant Barner made a statement to the effect that messing with him was like having a noose tied around your neck. (French Dep. at 164.)  In March 2000, Plaintiff alleges that, in response to her statement to the effect that Defendant Barner should not let an employee know what discipline was being imposed on her peers, Defendant Barner replied with a statement to the effect that if Plaintiff or one of her employees didn't like it, they could bring on the attorneys and he could handle it.  She alleges that Defendant Barner also used the expression, "bring on the attorneys," in response to other complaints or problems she discussed with him. (French Dep. at 133, 162, 164.) On August 16, 2000, Defendant Barner sent an e-mail message to Plaintiff requesting that she rewrite her units' annual goals. (French Dep. at 114-15; Ex. R. to Pltf.'s Resp.)

Plaintiff further alleges that Defendant Barner engaged in conduct which diminished her prestige or undermined her authority as a supervisor.  For example, one day when Plaintiff was out of the office, Defendant Barner expressed to others a concern that Plaintiff had not left anyone in charge of her unit.  When she returned the next day, he instructed her that she should have left someone in charge on that day. (French Dep. at 65-69.) On another occasion in June 2000, Defendant Barner allowed other supervisors to interview job applicants for positions in their units after Plaintiff had done the preliminary work of

identifying, screening, and running background checks on those applicants.  (French Dep. at 117-18; Ex. H to Pltf.'s Resp.)  Plaintiff further asserts that Defendant Barner authorized his administrative assistant, Ms. Shustella, to give orders to Plaintiff (French Dep. at 104-05), and assigned Plaintiff the menial task of arranging to have a vendor clean the carpets on two occasions between late December 1999 and early March 2000 (French Dep. at 98-99; Barner Dep. at 37).

Finally, Plaintiff alleges that she was the subject of several false accusations by Defendant Barner.  On one occasion, Defendant Barner accused Plaintiff and the staff under her supervision of not distributing mail to him.  (French Dep. at 59, 63-65.)  On another occasion, Defendant Barner blamed Plaintiff when the Records Division ran out of paper even though Defendant Barner had taken over the responsibility for ordering the paper himself.  (French Aff. 9-16-02, at 4.)  In May 2000, Defendant Barner told Plaintiff that one of her co-workers had complained about her and that she needed to attend a meeting regarding that complaint.  At the meeting, however, Plaintiff's co-worker allegedly denied complaining about Plaintiff.  (French Aff. 9-16-02, at 4.)  On another occasion in May 2000, Plaintiff claims that Defendant Barner failed to inform her that he was conducting an investigation of a complaint against her by the sheriff's office and that Defendant Barner may have placed negative information in her file regarding the investigation, which could affect her future prospects for promotions or upgrades.  (French Dep. at 105-06.)   In late August 2000, Defendant Barner raised concerns about the propriety of moving certain equipment into Plaintiff's office and ordered an audit of the equipment.  Plaintiff interpreted

Defendant Barner's statements as an accusation that she had stolen the equipment. (French Dep. at 124-25, 128-29.)

Plaintiff asserts that Defendant Molina-Mescall knew of Defendant Barner's discriminatory and retaliatory conduct and that she turned a blind eye to it. As evidence of this fact, Plaintiff points to the deposition testimony of Captain Saenz, who claimed that she had tried to bring the complaints of Plaintiff and other personnel within APD's Records Division to the attention of Defendant Molina-Mescall, and that Defendant Molina-Mescall summarily dismissed such complaints as unfounded. (Saenz Dep. at 15-21.) Plaintiff also points to Captain Saenz's deposition testimony regarding Defendant Molina-Mescall's possible role in placing Plaintiff's position on the list of positions targeted for layoffs. (Saenz Dep. at 42-44.)

With regard to the events described above, Plaintiff claims that she was treated differently than other similarly situated, non-African-American personnel within APD's Records Division. In particular, she alleges that other supervisors in the Records Division were allowed to work four ten-hour days per week and attend expensive, out-of-state training seminars. She further alleges that other supervisors were compensated for their on-call status, did not have their positions targeted for layoffs, were not required to rewrite their annual goals, and were not required to leave another person in charge of their units when they were out of the office. (French Aff. 9-16-02, at 2-3, 5-8; French Dep. at 69, 72, 114-16, 123.)

As to the reasons why she felt that there was a racial or retaliatory motive for the conduct of Defendants Barner and Molina-Mescall, Plaintiff points to Defendant Barner's use of the terms "spearheading" and "spear-chucking," as well as a comment attributed to Defendant Barner by one or more of Plaintiff's co-workers to the effect that Plaintiff was "used to going through the back door."  In her deposition testimony, Plaintiff indicated that she told Defendant Barner the term "spearchucking" was offensive to her the first time he used that term in her presence, and she could not recall whether or not Defendant Barner ever used the term "spearchucking" again.  (French Dep. at 84-85.)  Plaintiff acknowledged that the term "spearheading" may be used in a "nonracially offensive way," but maintained that Defendant Barner was using the term in a racially derogatory manner because she did not perceive him using that term in reference to other supervisors.  (French Dep. at 89-90.)

Plaintiff also points to the fact that Defendants Barner and Molina-Mescall knew of her EEOC complaint (and/or her plan to file such complaint) and that several of the alleged retaliatory actions took place after Defendants Barner and Molina-Mescall obtained this knowledge.  (French Dep. at 135-36.)  In addition, there is evidence that one of Plaintiff's coworkers, who was the only other African-American supervisor working in APD's Records Division at the time, also filed an EEOC complaint against Defendant Barner.  That co-worker transferred out of the Records Division on May 8, 2000.  (Ex. V to Pltf.'s Resp.)

Defendants deny that they engaged in any racially discriminatory or retaliatory conduct directed against Plaintiff in this case.  In particular, Defendant Barner denies that he ever used the term "spear-chuck" and explains that his use of the term "spearhead" and

-8-

the phrase "going through back door" were not intended to have a racial connotation. According to Defendant Barner, he picked up this terminology from his twenty-eight years of experience in the military. He believes that "spearheading" means "overseeing" a project, and that "going through the back door" means avoiding "red tape" and getting things done quickly and efficiently outside bureaucratic channels "through friends and so forth." (Barner Dep. at 34; Ex. C to Defs.' Mem. at 5-6.) While Defendant Barner admitted using the phrase "going through the back door," he did not use that phrase in Plaintiff's presence. (French Dep. at 94; Barner Dep. at 34.)

Defendants claim that they never demoted, disciplined, reprimanded, terminated, or refused a promotion to Plaintiff and that she did not suffer a loss in pay or a change in her title or job duties while Defendant Barner was her supervisor or thereafter. (Barner Aff. 8-19-02, at 1.) They also deny that any derogatory information was placed in her personnel file. (Barner Aff. 9-30-02, at 1; Vigil Aff. at 1-2.) Finally, Defendants dispute each of the specific instances of conduct which are the subject of Plaintiff's *Complaint*, and they claim that there were legitimate reasons for their conduct which are not discriminatory and not retaliatory.

II.    **ANALYSIS**

A.    **Standard of Review**

Under Fed. R. Civ. P. 56(c), the Court may enter summary judgment when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact, and that the moving party is entitled to judgment as a matter

of law.  A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986).  A fact is "material" if it might affect the outcome of the case.  See id. at 248.  Judgment is appropriate "as a matter of law" if the non-moving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

Where circumstantial evidence is the basis for a claim of employment discrimination brought under 42 U.S.C. § 1983, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e to 2000e-17 (1994 & West Supp. 2002), the burden of proof at the summary-judgment stage is determined according to the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  See Amro v. Boeing Co., 232 F.3d 790, 796 (10th Cir. 2000); English v. Colo. Dep't of Corrections, 248 F.3d 1002, 1007-08 (10th Cir. 2001).  Under this framework, the employee must establish a prima facie case of unlawful discrimination in order to survive a motion for summary judgment.  If the employee establishes a prima facie case, then the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment decision that is alleged to be unlawful.  If the employer meets this burden, then summary judgment is warranted unless the employee can show that there is a genuine issue of material fact as to whether the reasons preferred by the employer are pretextual or whether his race, age, gender, or other illegal consideration was

a determinative factor in the employment decision.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-49 (2000); Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1226 (10th Cir. 2000).

Evidence that the employer's decision was simply wrong or mistaken is not sufficient to show that the employer's reasons are pretextual because "the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."  Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994). Rather, a showing of pretext requires evidence that the reasons proferred by the employer are so weak, implausible, inconsistent, incoherent, or contradictory as to support a reasonable inference that the employer did not act for those reasons.  See Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997).  In particular, pretext may be shown by evidence concerning the "prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating hiring criteria); and the use of subjective criteria."  Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1328 (10th Cir. 1999); see also Kendrick, 220 F.3d at 1230.

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex Corp., 477 U.S. at 324; Wright-Simmons v. City of Okla. City, 155 F.3d 1264, 1268 (10th Cir. 1998).  Thus, "[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion.

-11-

Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995); see also Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995).  In addition, the Court may disregard an affidavit that contradicts the affiant's own sworn deposition testimony if the Court finds that such an affidavit constitutes an attempt to create a "sham fact issue."  Kendrick, 220 F.3d at 1223 n.2 (citing Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986)); see also Darnell v. Target Stores, 16 F.3d 174, 177 (7th Cir. 1994) (concluding that parties cannot create material issues of fact by submitting affidavits that contradict their own deposition testimony).

In this case, the parties have submitted affidavits, exhibits, and deposition testimony that contain hearsay and hearsay within hearsay.  In reviewing these materials to determine whether Defendants are entitled to summary judgment, the Court does not consider statements that affiants or deponents attribute to others for the purpose of proving the truth of the matters asserted therein, except for admissions by a party opponent (or agent thereof) which the affiant or deponent witnessed.  See Fed. R. Evid. 801(d)(2).  The Court does, however, consider statements attributed to third parties for other admissible purposes.  In particular, such statements may be considered for the limited purpose of showing their effect on the listener (such as the effect of threatening or offending Plaintiff).  See generally Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1434 (10th Cir. 1993).  They also may be considered as verbal acts or operative facts when legal consequences flow from the utterance of the statements.  See generally Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d 1068, 1087 (10th Cir. 2001); Griswold v. Fresenius USA, Inc., 978 F. Supp. 718,

722 (N.D. Ohio 1997).  In very limited circumstances, the type of statements in question may provide circumstantial proof of the knowledge, intent, or state of mind of the declarant.  See generally Fed. R. Evid. 803(3); see, e.g., United States v. Joe, 8 F.3d 1488, 1492 (10th Cir. 1993) (applying this rule to a declarant's statement that she was "afraid"); United States v. Freeman, 514 F.2d 1184, 1190 (10th Cir. 1975) (applying this rule to a declarant's statement of future intent to perform an act when the occurrence of that act was at issue).

Apart from these limitations imposed by the Federal Rules of Evidence, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the admissible evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all admissible evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

### B.    Plaintiff's Claims of Discrimination and Retaliation

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that:  "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  This language applies to employment discrimination claims against public employers, which are actionable under both 42 U.S.C. § 1983 and Title VII of the Civil Rights Act.  See Brown v. Hartshorne Pub. Sch. Dist. No. 1, 864 F.2d 680, 682-83 (10th Cir. 1988); Notari v. Denver Water Dep't, 971 F.2d 585, 587 (10th Cir. 1992).

Title VII of the Civil Rights Act makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2002e-2(a)(1).  Title VII also makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed . . . an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

In this case, Plaintiff alleges that Defendants engaged in racial discrimination in violation of 42 U.S.C. § 2000e-2(a)(1) and the Equal Protection Clause, as well as retaliation in violation of 42 U.S.C. § 2000e-3(a).  Plaintiff further asserts that the alleged racial discrimination and retaliation took two forms:  disparate treatment and the creation of a hostile work environment.  Each of these claims is addressed below.

### 1.    Plaintiff's Hostile Work Environment Claim

Although the recognition of hostile work environments as an unlawful employment practice (or a denial of equal protection of the laws) may have originated from sexual harassment cases, see, e.g., Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993), this form of unlawful employment practice has been recognized in cases alleging racial discrimination as well, see Wright-Simmons, 155 F.3d at 1270; Trujillo v. Univ. of Colo. Health Sciences Ctr., 157 F.3d 1211, 1214 (10th Cir. 1998); cf. Nieto v. Kapoor, 268 F.3d 1208, 1218 (10th Cir. 2001) (recognizing hostile work environment that involved both racial and gender

-14-

discrimination).  Hostile work environment claims also have been recognized to some degree in cases involving retaliation. See Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1264-65 (10th Cir. 1998).

Not every instance of bothersome or inappropriate behavior with a racial or retaliatory connotation, however, is deemed to create a hostile work environment that violates Title VII or the Equal Protection Clause.  The standards developed by the Supreme Court for determining whether such an environment exists are not intended to become a '"general civility code'" encompassing normal job stress and ordinary tribulations of the workplace, such as the sporadic use of abusive language and occasional teasing, Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998), or "a few isolated incidents of racial enmity," Trujillo, 157 F.3d at 1214; accord Bolden v.PRC Inc., 43 F.3d 545, 551 (10th Cir.1994).

In order to distinguish such ordinary tribulations and job stress from the type of discriminatory or retaliatory conditions of employment that are actionable under Title VII or 42 U.S.C. § 1983, the Supreme Court has developed a two-part test.  To pass the first part of this test, the conduct at issue must be '"severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive.'"  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (quoting Harris, 510 U.S. at 21); accord Wright-Simmons, 155 F.3d at 1269.  Under the second part of the test, the conduct at issue must be "one that the victim in fact did perceive to be" hostile or abusive.  Faragher, 524 U.S. at 787; accord Wright-Simmons, 155 F.3d at 1269.

"[T]he objective severity of the harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" <u>Oncale</u>, 523 U.S. at 81 (1998) (quoting <u>Harris</u>, 510 U.S. at 23).  Careful consideration must be given to "the social context in which particular behavior occurs and is experienced by its target." <u>Id.</u>  While "no single factor is required," courts and juries may take into account "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  <u>Harris</u>, 510 U.S. at 23; <u>accord</u> <u>Faragher</u>, 524 U.S. at 787; <u>Nieto</u>, 268 F.3d at 1218.  The "effect on the employee's psychological well-being" also may be a relevant factor, although a plaintiff is not required to prove that she suffered injury or that her psychological well-being was seriously affected in order to prevail on a Title VII claim alleging a hostile or abusive work environment.  <u>Harris</u>, 510 U.S. at 22-23.

Based on the admissible evidence submitted with the parties' briefs, the Court concludes that Defendants are entitled to summary judgment regarding Plaintiff's hostile work environment claims.  While it is undisputed that Plaintiff subjectively perceived Defendants' conduct to be racially hostile and abusive, the conduct alleged here is not objectively severe or pervasive enough to constitute racial discrimination or retaliation in the form of a hostile work environment under the framework set forth above.

The relevant conduct at issue here consists of some offensive utterances with a racial connotation, an occasion on which Defendant Barner got up from his chair and approached Plaintiff in a manner that caused her to feel physically threatened, and a series of incidents

in which Defendant Barner criticized, supervised, investigated, or assigned work to Plaintiff in a manner that caused her to feel diminished in prestige or authority.

Defendant Barner's alleged utterances with a racial connotation are limited to the use of the terms "spearchucking" and "spearheading," and a comment relayed to Plaintiff by two of her coworkers to the effect that Defendant Barner said she was "used to going through the back door." These utterances are not nearly as severe or pervasive as the racial slurs and racially derogatory comments that were found to create a racially hostile work environment in Wright-Simmons, 155 F.3d at 1266, or Nieto, 268 F.3d at 1218-20. Rather, they are more analogous to the sporadic use of inappropriate language that was deemed insufficient to create a hostile work environment in Bolden, 43 F.3d at 551, and Gross, 53 F.3d at 1542-43.

The single occasion on which Plaintiff felt physically threatened by the manner in which Defendant Barner allegedly rose from his chair and approached her also does not meet the objective element of the test for a hostile work environment. The alleged conduct of Defendant Barner on this single occasion does not support a reasonable inference that his physically threatening behavior was pervasive. Moreover, the act of rising from one's desk in the manner described by Plaintiff cannot be characterized as a severe form of physical threat, especially when compared to the paradigmatic cases by which the Tenth Circuit has defined the parameters of a hostile work environment. See, e.g., Nieto, 268 F.3d at 1213-14 (affirming the district court's finding of a hostile work environment which involved repeated instances of throwing objects at employees and fondling women's breasts).

-17-

Further, "Title VII . . . does not give a woman immunity from being reprimanded in the presence of her co-workers if her supervisor believes that she has violated work rules or has been negligent in performing her job." Gross, 53 F.3d at 1545-46. A plaintiff cannot survive a summary-judgment motion simply by alleging that her supervisor's decisions in this regard were wrong or mistaken. See Pamintuan v. Nanticoke Mem. Hosp., 192 F.3d 378, 387 (3d Cir. 1999). The loss of prestige or authority that Plaintiff felt as a result of the criticism, supervision, investigation, or work assignments that she received from Defendant Barner falls into the category of "monitoring and job stress typical of life in the real world" and is not actionable under Title VII or 42 U.S.C. § 1983 as a hostile work environment. Trujillo, 157 F.3d at 1214. Thus, Defendants are entitled to summary judgment on Plaintiff's hostile work-environment claims.

## 2.   <u>Plaintiff's Disparate Treatment Claims</u>

The Court next addresses Plaintiff's claims of disparate treatment. In order to establish a prima facie case of racial discrimination in the form of disparate treatment, Plaintiff must show "(1) that [s]he is a member of a racial minority, (2) that [s]he suffered an adverse employment action, and (3) that similarly situated employees were treated differently." Trujillo, 157 F.3d at 1215. In order to establish a prima facie case of retaliation in the form of disparate treatment, Plaintiff must show "(1) that . . . she engaged in protected activity; (2) that the employer took an adverse employment action against the plaintiff; and (3) that there exists a causal connection between the protected activity and the adverse action." Aquilino v. Univ. of Kansas, 268 F.3d 930, 933 (10th Cir. 2001).

It is undisputed that, as an African-American, Plaintiff is a member of a racial minority.  It is also undisputed that she engaged in protected activity by voicing her objections to Defendant Barner's use of terminology that is racially derogatory or offensive, filing charges of discrimination and retaliation with the EEOC, and pursuing this litigation.

### a.   <u>Failure to Compensate Plaintiff For Being On Call</u>

For the purpose of establishing a *prima facie* case of discrimination or retaliation, the only conduct by Defendants that falls within the definition of an "adverse employment action" is their failure to compensate Plaintiff for the weeks that she was on call.  "The Supreme Court has explained that '[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  <u>Aquilino</u>, 268 F.3d at 934 (quoting <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998)).  Such action includes depriving an employee of compensation that the employee has earned.

In this case, Plaintiff has presented the deposition testimony of Captain Saenz, who indicated that APD has an "SOP" (or standard operating procedure) that says "you will be compensated eight straight hours of straight comp time for every week that you're on-call." (Saenz Dep. at 50.)  Plaintiff also presented evidence that Defendant Barner required her to be on-call twenty-four hours per day, seven days per week from September 1999 to October 2000, and that she was not compensated for being on call during this period of time.  (French Aff. 9-16-02, at 2; Ex. F to Pltf.'s Resp.)

In response to this claim, Defendants do not deny that the City has a policy of compensating employees for being on-call or that Plaintiff was in fact on-call.  (Def.'s Reply at 4-5.)  Defendants simply indicate that Plaintiff never complained to Defendant Barner or asked him for compensation for her on-call status.  (Barner Aff. 9-30-02, at 2; French Dep. at 27.)  In addition, the Court notes Captain Saenz's admission that she did not know whether people actually were compensated for being on call because she "didn't sign any comp slips for that."  (Saenz Dep. at 12.)

In the absence of any admissible evidence that Plaintiff submitted a claim for compensation during Defendant Barner's tenure as her supervisor, or that other similarly situated employees were actually compensated for being on call during that period, Plaintiff has failed to establish that she was treated differently in this regard because of her race.  Thus, with respect to her on-call status, Plaintiff has failed to establish a prima facie case of racial discrimination in the form of disparate treatment.  See Trujillo, 157 F.3d at 1215.

Nevertheless, Plaintiff has presented sufficient evidence to support a reasonable inference that Defendants' failure to compensate her for being on call is retaliatory.  It cannot be disputed that Plaintiff has engaged in "protected activity" by pursuing this litigation against Defendants, and the fact that Plaintiff's claim for compensation relating to her on-call status was first presented in the context of this litigation does not justify withholding such compensation when there is no dispute that the City has a policy of compensating employees for being on call and that Plaintiff was, in fact, on call.  Defendants have not come forward with evidence of a legitimate, non-retaliatory reason for denying Plaintiff's claim for

-20-

compensation relating to her on-call status at this juncture, and the failure to comply with the City's standard operating procedure with regard to this issue is indicative of pretext. <u>See</u> <u>Kendrick</u>, 220 F.3d at 1230. Thus, Defendants are not entitled to summary judgment on Plaintiff's retaliation claim as it relates to the failure to compensate her for being on-call.

**b.      <u>Defendants' Other Conduct</u>**

As to the other conduct which forms the basis for Plaintiff's disparate-treatment claims, however, Defendants are entitled to summary judgment because that conduct does not constitute an "adverse employment action" under the applicable law. While the Tenth Circuit liberally defines the term "adverse employment action" in disparate-treatment cases to encompass more than just "monetary losses in the form of wages or benefits," this definition does not include "'a mere inconvenience or an alteration in [Plaintiff's] job responsibilities,'" <u>Sanchez v. Denver Pub. Sch.</u>, 164 F.3d 527, 532 (10th Cir. 1998) (quoting <u>Crady v. Liberty Nat'l Bank & Trust Co.</u>, 993 F.2d 132, 136 (7th Cir.1993)), or other actions which "had, at best, a de minimis effect on her future employment opportunities." <u>Aquilino</u>, 268 F.3d at 934. "Speculative harm does not constitute adverse employment action." <u>Id.</u> at 936.

It follows that changes in work assignments, criticism by a supervisor, or other negative comments about an employee that do not cause any present or foreseeable future economic injury are not adverse employment actions, regardless of the fact that they may result in feelings of diminished prestige. <u>See Davis v. Town of Lake Park</u>, 245 F.3d 1232, 1240-45 (11th Cir. 2001); <u>accord Primes v. Reno</u>, 190 F.3d 765, 767  (6th Cir. 1999).

Investigations prompted by allegations of employee misconduct also do not constitute adverse employment actions when they are performed in a routine manner following the regular and legitimate practices of the employer.  See Stockett v. Muncie Indiana Transit Sys., 221 F.3d 997, 1001-02 (7th Cir. 2000) (discussing a requirement that an employee submit to a drug test).  These principles are particularly germane when any negative information about the employee is removed from the employee's personnel file before any threat of economic injury materializes.  See Davis, 245 F.3d at 1242-43.

In this case, Plaintiff has retained her supervisory position in APD's Records Division and has presented no evidence that she applied for, or was refused, a promotion based on the alleged racially discriminatory or retaliatory conduct of Defendants.  While Plaintiff contends that Defendant Barner left behind some documents containing negative information about her when he ceased being her supervisor, there is no evidence that such information remains in her personnel file or has caused any significant adverse effect on her future employment opportunities.  Her various other complaints about Defendant Barner's treatment of her, such as his denial of her request for four-day work weeks and his suggestion that she take a business-writing class at TVI instead of attending a more expensive seminar on that subject, are mere inconveniences that do not rise to the level of adverse employment actions.  See Sanchez, 164 F.3d at 532; Aquilino, 268 F.3d at  934.

Even assuming that some of these actions rose to the level of an adverse employment action, Defendants have come forward with legitimate reasons for them that are not discriminatory or retaliatory.  First, Defendant Barner claims that his denial of Plaintiff's

-22-

request to work four ten-hour days per week was conditioned on the need to get Plaintiff to fill a relatively large number of vacant positions in the units under her supervision.  He claims that he told Plaintiff:  "If you fill at least three of the five vacancies, then we can renegotiate on your ten-hour shifts."  Defendant Barner also claims that he denied one other supervisor's request for ten-hour shifts, and that Plaintiff's delay in filling the vacant positions in her unit also explains why he allowed other supervisors to interview candidates that Plaintiff had screened.  (Barner Dep. at 38-41; Barner Aff. 9-30-02, at 1.)

With regard to Plaintiff's claim that she was unfairly targeted in City-wide layoffs, Defendants assert that dozens of City employees were targeted for layoffs in Spring 2002 because of budget problems and that Plaintiff was a possible target because she was a more junior person in her job code.  Defendants also point out that Plaintiff was not laid off and that the need for a layoff was avoided because a senior person retired and another was transferred.  (Molina-Mescall Aff. at 2.)  In addition, Captain Saenz's deposition testimony is unclear as to why Plaintiff's position was targeted in the layoffs.  (Saenz Dep. at 42-44.)

Defendant Barner claims that he denied Plaintiff's request to attend a seminar on business writing skills because less expensive training that would achieve the same results was locally available, and that the more expensive seminar attended by other supervisors in APD's Records Division was warranted because it related to a critical need of the Division and no similar training was offered locally or at a lesser cost.  (Barner Aff. 9-30-02, at 2; Ex. S to Pltf.'s Resp.)

As for requiring Plaintiff to rewrite her annual goals, Defendant Barner asserts that Plaintiff was not the only person under his supervision who was required to rewrite such goals, and that this requirement was justified with respect to Plaintiff because the goals she submitted were abstract and not quantifiable.  (Barner Aff. 9-30-02, at 3.)   Regarding Plaintiff's claim that she was the only supervisor who was told to leave someone in charge of her unit when she was absent, Defendant Barner claims that it was not necessary to give this instruction to other supervisors because they left people in charge without being told and did not leave their units unattended.  (Barner Aff. 9-30-02, at 2.)

Defendants also point out that Plaintiff's own deposition testimony indicates that she performed the task of arranging for a vendor to clean the carpets both before and after Defendant Barner was her supervisor.  (French Dep. at 96, 98.) With regard to the claim that Defendant Barner gave his administrative assistant some type of supervisory authority over Plaintiff, Plaintiff's own deposition testimony further indicates that Defendant Barner's assistant was simply relaying instructions from Defendant Barner, as Plaintiff could not identify any instances in which the secretary was telling her to do something that Defendant Barner had not ordered.  (French Dep. at 105.)

As for Plaintiff's claim that Defendant Barner falsely accused her of not distributing mail to him, Defendant Barner asserts that one of Plaintiff's units was responsible for mail distribution in the Records Division and that his administrative assistant could not carry out her duty to distribute mail to him if Plaintiff's unit did not first distribute his mail to his administrative assistant.  (Barner Aff. 9-30-02, at 2.)  He also claims that when he attempted

-24-

to order paper for the Records Division, Plaintiff knew of the correct procedure but failed to inform him.  (Barner Aff. 9-30-02, at 3.)

Defendant Barner denies Plaintiff's claim that he accused her of stealing or requested an audit in conjunction with such an acquisition.  In this regard, Defendants point out Plaintiff's admission in her own deposition testimony that Defendant Barner did not use the word "steal" (or any obvious synonyms) and that Defendant Barner only "requested an inventory."  These alleged statements were not made in her presence.  (French Dep. at 124-128.)  "An employee's supervisor has the right to express concern about misuse of company equipment."  Gross, 53 F.3d at 1545.

As for the investigation that resulted in a temporary suspension of Plaintiff's computer privileges, Defendants assert that the investigation was prompted by an anonymous letter received by the Chief of APD which stated that Plaintiff had been deleting criminal histories from APD records and adding false charges to other records.  There is no indication that Defendants played any role in sending this letter to the Police Chief.  Defendants further assert that the temporary suspension of Plaintiff's computer privileges was justified by the need to prevent the loss of information in the event that the charges were true.  After the allegations were determined to be unfounded, Plaintiff's computer privileges were restored, and no discipline was imposed on her.  (Wosick Aff. at 1-2.)

In response to Defendants' contentions, Plaintiff points out that some of Defendant Barner's criticisms of her were wrong or mistaken and that Defendants' internal investigations or audits regarding the equipment in her office and her computer privileges

-25-

resulted in her exoneration..  Plaintiff's assertions in this regard may cast some doubt on whether Defendant Barner (or others who were critical of her work) acted in a manner that was wise, shrewd, prudent, or competent.  It does not follow, however, that Defendants' reasons for their actions are pretextual, "since the question at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes, 32 F.3d at 765.  Plaintiff cannot survive summary judgment simply by alleging that Defendants' decisions was wrong or mistaken. See Pamintuan, 192 F.3d at 387.

With the exception of the failure to compensate Plaintiff for being on call, Plaintiff has not presented evidence that is sufficient to create a genuine issue of material fact regarding whether Defendants took any adverse employment action against her.  With regard to Defendants' other conduct, Defendants have come forward with legitimate reasons that are not discriminatory, retaliatory, or pretextual.  Accordingly, Defendants are entitled to summary judgment on all of Plaintiff's disparate treatment claims except for her retaliation claim relating to Defendants' failure to compensate her for the weeks that she was on call.

## III.   **CONCLUSION**

For the foregoing reasons, Defendants are entitled to summary judgment with respect to Plaintiff's hostile work environment claims and with respect to all of Plaintiff's disparate treatment claims except for her claim of retaliation based on Defendants' failure to compensate her for the weeks she was on call from September 1999 to October 2000.

**IT IS, THEREFORE, ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. No. 35] is **DENIED IN PART** with respect to Plaintiff's retaliation claim based on Defendants' failure to compensate her for the weeks she was on call from September 1999 to October 2000.

**IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. No. 35] is **GRANTED IN PART** with respect to all of Plaintiff's other claims.

**SO ORDERED**, this 28th day of May, 2003, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge